UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| KAREN CRANE-MCNAB, BERT CRANE, and MARY CRANE COUCHMAN, individuals, KAREN CRANE-MCNAB, LLC; BERT CRANE ORCHARDS, L.P.; MARY CRANE COUCHMAN TRUST; and MARY CRANE COUCHMAN FAMILY PARTNERSHIP, L.P., <br><br>        Plaintiffs, <br><br>    v. <br><br>COUNTY OF MERCED, and DOES 1 to 20, <br><br>        Defendants. | NO. CIV. 1:08-1218 WBS SMS <br><br> <u>MEMORANDUM OF DECISION</u> |

----oo0oo----

This action involves land owned by plaintiffs,[1] which they allege has been contaminated by a neighboring landfill

---

[1] Karen Crane-McNab, Bert Crane, and Mary Crane Couchman have been dismissed from the state law causes of action. (Order on Defs.' Partial Mot. to Dismiss Third Am. Compl. (Docket No. 53).)

1

operated by the Merced County ("County"). The court held a four-day bench trial, lasting from January 24, 2011, to January 27, 2011. This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

I. <u>Factual and Procedural History</u>

Plaintiffs own approximately 4500 acres of land ("Crane property") in Merced County to the west of Highway 59. Highway 59 is part of a Caltrans right of way that is approximately 120 to 150 feet wide. To the east of the right of way is a landfill owned by the Merced County Regional Waste Management Authority[2] and operated by the County. Most of plaintiffs' claims relate to six lots directly to the west of Highway 59 that are allegedly affected by the landfill.[3] Other claims relate to portions of the Crane property further to the west, surrounding Canal Creek and Edendale Creek.[4] Cattle grazing is the highest and best use

---

[2] The Authority is made up of Merced County and the cities of Los Banos, Atwater, Livingston, Dos Palos, and Gustine.

[3] Per the Order on Defendant's Summary Judgment Motion (Docket No. 153) dated November 13, 2010, plaintiffs' claims regarding volatile organic compound ("VOC") migration are only recoverable as to Lot 1, a 150-acre parcel on the southern end of the landfill-related properties, owned by Karen Crane-McNab, LLC.

[4] The parcels at issue for the claims involving the Highway 59 landfill are: Lot 1, APN: 052-150-013; Lot 2, APN: 052-150-012; Lot 3, APN: 052-150-010; Lot 17, APN: 052-150-009; Lot 18, APN: 052-150-011; Lot 59, APN: 052-070-013; and Lot 60, APN: 052-070-011. The parcels at issue for the claims involving Edendale and Canal Creeks are: Lot 23, APN 052-080-008; Lot 24, APN 052-080-007; Lot 25, APN 052-080-006; Lot 26, APN 052-080-015; Lot 27, APN 052-080-014; Lot 28, APN 052-080-013; Lot 29, APN 052-080-012; Lot 30, APN 052-050-030; Lot 30, APN 052-080-011; Lot 31, APN 052-080-009; Lot 39, APN 052-040-080; Lot 39, APN 052-090-036; Lot 40, APN 052-040-084; Lot 40, APN 052-090-037; Lot 43, APN 052-040-078; Lot 44, APN 052-050-031;

2

of the Crane property.  Permanent crops or buildings are not permitted on most, if not all, of the landfill-related lots.  For the past five or six years, 3300 acres of the Crane property have been rented to John McGill for $28 per acre annually for cattle grazing.

The landfill has been in operation since 1973, and consists of three waste disposal areas.  Phases 1 through 4, which opened in 1973 and are unlined, are on the southeastern edge of the landfill and are approximately 500 feet from the Crane property at the closest point.  Phase 5, which is newer and lined with a plastic barrier, is on the southwestern edge and is approximately 250 feet from the Crane property at the closest point.  To the north of those phases is a mitigation area currently used for cattle grazing; above the mitigation area is Phase 6, which is not yet operational.

The County also operates two creeks that run through the Cranes' property and then into Castle Dam: Canal Creek and Edendale Creek ("the creeks").[5]  In 1993, the United States took certain land in easements by fee in order to build Castle Dam and

---

Lot 44, APN 052-040-079; Lot 48, APN 052-050-026; Lot 47, APN 052-050-027; Lot 47, APN 052-080-016; Lot 48, APN 052-050-026; Lot 49, APN 052-050-025; Lot 50, APN 052-050-032; Lot 51, APN 052-050-024; Lot 52, APN 052-050-023; Lot 53, APN 052-050-022; Lot 55, APN 052-050-021; Lot 56, APN 052-050-033; Lot 56, APN 052-080-019; Lot 57, APN 052-080-020; Lot 57, APN 052-050-034; Lot 58, APN 052-060-015; Lot 58, APN 052-080-021; Lot 58, APN 052-070-012; and Lot 58, APN 052-050-035.  The individual lots at issue are each owned by one of the plaintiffs, rather than collectively or jointly.

[5]   The County "operates and maintains" the creeks (Pretrial Order at F. ¶ 6), which are owned in fee by the Merced Irrigation District.  (Id. at F. ¶ 94.)

3

Reservoir Unit. This included a flood easement on the Crane property to account for any future flooding caused by the Dam, for which they were compensated. Plaintiffs are required to apply for a permit before planting any crops on the creek-related lots.

Plaintiffs' complaint can be separated into four distinct allegations: (1) volatile organic compounds ("VOCs") have migrated through the soil from the landfill onto Lot 1; (2) trash and odors are blown onto the Crane property from the landfill by the wind; (3) runoff water from the landfill floods Lot 1; and (4) debris from the creeks accumulates on the Crane property.

After a partial grant of summary judgment in this case on several issues of fact and law (Docket No. 153), seven claims remain: (1) inverse condemnation under federal and state law regarding VOC migration, trash, and creek debris; (2) trespass regarding VOC migration; (3) nuisance regarding VOC migration, trash, and odors; (4) negligence regarding VOC migration; (5) negligent failure to warn regarding VOC migration; (6) violation of the Due Process Clause of the Fourteenth Amendment; and (7) declaratory relief.

II. Discussion

Under the California Constitution article I, section 19, property may not be taken or damaged for public use without just compensation to the owner. Inverse condemnation is a constitutional remedy permitting recovery of consequential damages arising from public projects. Foreseeability is not required, Albers v. Cnty. of L.A., 62 Cal. 2d 250, 263-264

4

(1965), and tort concepts like fault or negligence are not applicable. <u>Bunch v. Coachella Valley Water Dist.</u>, 15 Cal. 4th 432, 436 (1997). Instead, the government is strictly liable for any physical injury to property substantially caused by a public improvement as it was deliberately designed and constructed. <u>Bunch</u>, 15 Cal. 4th at 440; <u>Pac. Bell v. City of San Diego</u>, 81 Cal. App. 4th 596, 602 (4th Dist. 2000); <u>Marshall v. Dep't of Water & Power</u>, 219 Cal. App. 3d 1124, 1139 (2d Dist. 1990) ("[A] governmental entity may be held strictly liable, irrespective of fault, where a public improvement constitutes a substantial cause of the plaintiff's damages even if only one of several concurrent causes.").

To establish liability for inverse condemnation under the <u>Albers</u> standard, plaintiffs must establish, by a preponderance of the evidence, four elements: "First, that [they] ha[ve] an interest in real or personal property; Second, the [County] substantially participated in the planning, approval, construction or operation of a public project or public improvement; Third, [plaintiffs'] property suffered damage; and Fourth, the [County's] project, act or omission was a substantial cause of the damage." <u>Yamagiwa v. City of Half Moon Bay</u>, 523 F. Supp. 2d 1036, 1088 (N.D. Cal. 2007) (emphasis omitted).

Similarly, the Fifth Amendment of the United States Constitution provides in relevant part that "private property [shall not] be taken for public use, without just compensation." The Takings Clause is applicable to the states through the

Fourteenth Amendment.[6] <u>Dolan v. City of Tigard</u>, 512 U.S. 374, 383 (1994). Physical possession of the property is not a necessary element of a takings claim. "A taking can occur simply when the Government by its action deprives the owner of all or most of his interest in his property . . . it is the loss to the owner of the property and not the accretion to the Government which is controlling in fifth amendment cases." <u>Aris Gloves, Inc. v. United States</u>, 420 F.2d 1386, 1391 (Ct. Cl. 1970).

To establish a claim for trespass, plaintiffs must plead and prove, by a preponderance of the evidence, the following: (1) plaintiffs owned the property; (2) the County intentionally, recklessly, or negligently entered plaintiffs' property or caused the contaminants or debris to enter plaintiffs' property; (3) plaintiffs did not give the County permission for the entry; (4) plaintiffs were harmed; and (5) the County's conduct was a substantial factor in causing that harm. See <u>Vega v. JPMorgan Chase Bank, N.A.</u>, 654 F. Supp. 2d 1104, 1119 (E.D. Cal. 2009). "A trespass may be on the surface of the land, above it, or below it. The migration of pollutants from one property to another may constitute a trespass . . . ." <u>Martin Marietta Corp. v. Ins. Co. of N. Am.</u>, 40 Cal. App. 4th 1113, 1132 (2d Dist. 1995) (internal citation omitted).

California Civil Code section 3479 defines a nuisance as "[a]nything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of

---

[6] Plaintiffs' "due process" claim under the Fourteenth Amendment appears to be duplicative of their takings claim.

6

life or property . . . ." Cal. Civ. Code § 3479. "The statutory definition of nuisance appears to be broad enough to encompass almost any conceivable type of interference with the enjoyment or use of land or property." Stoiber v. Honeychuck, 101 Cal. App. 3d 903, 919 (5th Dist. 1980). "The migration of pollutants from one property to another may constitute . . . a nuisance . . . ." Marietta, 40 Cal. App. 4th at 1132.

In their negligence claim, plaintiffs allege negligence per se for various violations of California law, and also argue that res ipsa loquitur applies. A presumption of negligence arises if: (1) the defendant violated a statute; (2) the violation proximately caused the plaintiff's injury; (3) the injury resulted from the kind of occurrence the statute was designed to prevent; and (4) the plaintiff was one of the class of persons the statute was intended to protect. Quiroz v. Seventh Ave. Ctr., 140 Cal. App. 4th 1256, 1285 (6th Dist. 2006). Plaintiffs argue that the County is negligent per se based on its violations of (1) California Civil Code section 3479 (nuisance); (2) California Health and Safety Code sections 25189(c) and (d) (intentional and negligent disposal of hazardous waste in an unauthorized manner); (3) California Health and Safety Code section 25359.4 (release of a reportable quantity of hazardous substances without reporting said release); (4) California Health and Safety Code section 25359.5 (obligation to secure site of hazardous substance release); (5) California Civil Code section 851 (obligation to notify potentially responsible parties of release).

"In order to invoke res ipsa loquitur, the plaintiff

7

has the burden to establish three conditions: '(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.'" Howe v. Seven Forty Two Co., 189 Cal. App. 4th 1155, 1161 (2d Dist. 2010) (quoting Prosser, Law of Torts § 39, at 214 (4th ed. 1971)).

Plaintiffs' claim for negligent failure to warn is brought under California Health and Safety Code section 25359.5 and California Civil Code section 851, described above.

Finally, declaratory relief is appropriate when the facts alleged "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of declaratory judgment." Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1192 (9th Cir. 2000) (quoting Wickland Oil Terminals v. Ascaro, Inc., 792 F.2d 887, 893 (9th Cir. 1986) (internal quotation mark omitted)).

A.  VOC Migration

Plaintiffs' claims for inverse condemnation, trespass, nuisance, negligence, and failure to warn are based in whole or in part on the allegation that VOCs migrated from the landfill onto Lot 1 of the Crane property. Timothy Souther of AMEC Geomatrix, an environmental consulting firm, testified regarding the migration, explaining that several VOCs were found in the soil on Lot 1. Plaintiffs argue that the VOCs found in Lot 1 must have migrated from the landfill because the landfill contains VOCs and migration of VOCs is known to have occurred to

8

the north and south of the landfill.

The court finds that plaintiffs' theory is unconvincing for several reasons.  First, while plaintiffs presented evidence that VOCs were found in Lot 1, their testing techniques were severely flawed, making their data questionable.  Second, the VOCs found in Lot 1 were not identical in kind or quantity to those found in the landfill.  Third, the reasons migration occurred to the north and south did not apply to the western border.  Finally, the VOCs present in Lot 1 could have come from sources other than the landfill.

Defense expert E. Wayne Pearce, a geologist for SCS Engineers, testified at length regarding the problems with the testing performed in Lot 1.  He concluded that the tests performed by plaintiffs were "indefensible" and could not be relied upon.  His testimony on the subject was unimpeached.  First, plaintiffs should have tested for methane and carbon dioxide, which normally travel with other landfill gases, but they failed to do so.  Not only does this indicate a lack of experience on the part of plaintiffs' experts in performing such tests, but it also makes it difficult to ascertain whether the VOCs came from the landfill or from another source.  Second, to take the sample, plaintiffs used an older section of PVC pipe that had been glued together.  Solvents and glues contain large quantities of VOCs, which would contaminate the sample taken through the pipe.  A related problem is that plaintiffs did not conduct a "blank" test to determine whether the equipment used affected the results.  Third, testing usually includes a duplicate sample drawn at the same time and from the same

location, which the laboratory analyzes independently without knowing its origin, as a way to verify the laboratory results. This quality control measure was performed with samples taken at different times, and the two results were significantly different.  Fourth, plaintiffs took an ambient air sample but failed to document the wind direction present at the time, making that reading useless.  Fifth, the location at which the sample was taken could only provide information for a small area of influence, approximately fifty to one hundred feet.  Defense expert Paul Damian, a risk assessor for SCS Engineers, testified that for purposes of risk assessment he would at a minimum use ten sampling sites to ensure accurate data for the area.  Because VOCs are detected in parts per billion, testing must be particularly careful in order to avoid false positives or inaccurate readings.  Since plaintiffs' testing did not follow the procedures necessary to ensure accurate readings, their data is not credible.

Patrick Sullivan of SCS Engineers testified that not only were plaintiffs' testing techniques unreliable but also that the data did not show that VOCs migrated from the landfill.  The court finds Mr. Sullivan to be a credible witness and well-qualified to testify as an expert on this subject.  According to Mr. Sullivan, there was no "fingerprint match" between the chemicals found in the landfill and those found in Lot 1. (See Def. Trial Ex. 1003 (showing the chemicals found in the landfill and in Lot 1).)  This makes it much less likely that the chemicals in Lot 1 came from the landfill.  Migration from a landfill would almost certainly contain methane, carbon dioxide,

and freons.  Freons were found in the landfill but not in Lot 1, and plaintiffs failed to test for methane and carbon dioxide. Furthermore, some of the chemicals detected in Lot 1 were actually found in higher quantities than those detected in the landfill, indicating that they could not have come entirely from the landfill.  Some of the Lot 1 chemicals were not even detected in the landfill.

Furthermore, migration to the west does not logically follow simply because migration occurred to the north and south. A large plastic-lined cell, Phase 5, sits between the unlined cells and the Crane property, whereas there is no physical barrier between the unlined cells and the property to the north and south.  The unlined cells are also older, and contain chemicals that are no longer permitted in modern landfills.  In addition to the differences between the western border and the northern and southern borders, testimony showed that the way in which chemicals move through soil is variable and slow, and depends in large part on the soil material.  Movement is not uniform in every direction.  Thus, it is possible that VOC migration occurred to the north and south of the landfill without necessarily occurring to the west.

The chemicals in Lot 1 could have come from any number of sources.  Mr. Sullivan testified that many of the chemicals present in Lot 1 are found in petroleum, which could just as easily have come from the highway or from vehicles driving on the Crane property.  The amount found in the soil could have been caused by less than a gallon of petroleum.  For the foregoing reasons, plaintiffs have not shown by a preponderance of the

11

evidence that the chemicals found in the soil of Lot 1, if they existed at all, came from the landfill.

Because plaintiffs have failed to show that VOCs migrated from the landfill to Lot 1, they cannot succeed on their VOC-related claims. Plaintiffs' claim that VOC migration constitutes inverse condemnation fails because they have not shown any injury to their property caused by the County under either the Fifth Amendment to the United States Constitution or the California Constitution article I, section 19. See Aris Gloves, 420 F.2d at 1391 (government must have deprived owner of interest in property under United States Constitution); Yamagiwa, 523 F. Supp. 2d at 1088 (plaintiffs must prove that property suffered damage under California Constitution). Similarly, plaintiffs failed to show that the County intentionally, recklessly, or negligently caused any contaminants to enter the property, and thus they cannot recover for trespass. See Vega, 654 F. Supp. 2d at 1119. By failing to show that VOCs from the landfill "interfere[d] with" their property, plaintiffs also cannot recover under a theory of nuisance. See Cal. Civ. Code § 3479.

As to their various theories of negligence, plaintiffs have failed to prove the necessary elements by a preponderance of the evidence. The County is alleged to have been negligent per se based on its violations of California Civil Code section 3479 for nuisance, California Health and Safety Code sections 25189(c) and (d) for negligently or intentionally disposing of hazardous waste in an unauthorized manner, California Health and Safety Code section 25359.4 for release of a reportable quantity of

12

hazardous substances without reporting said release, California Health and Safety Code section 25359.5 for failure to secure the site of a hazardous substance release, and California Civil Code section 851 for failure to notify potentially responsible parties of a release.  Plaintiffs' claim for nuisance has already been shown to have failed, and the other statutes all involve the disposal or release of hazardous substances.  Defense witness Ambrose McCready, a project manager for SCS Engineers, was unimpeached in his testimony that the landfill met all standards of care for the state of California; plaintiffs have not demonstrated that any waste was disposed of in an unauthorized manner, much less negligently or intentionally.  Nor have plaintiffs presented any evidence that the County knew that it was releasing a reportable quantity of hazardous substances or that the County did release such substances.  No presumption of negligence can arise from the County's actions, and res ipsa loquitur does not apply because no "event" has been shown to have happened that could be the basis for a finding of negligence.

   Finally, plaintiffs' claim for failure to warn is based on two of the same statutes, California Health and Safety Code section 25359.5 and California Civil Code section 851, which the court found were not violated with regards to negligence per se. The County cannot be required to warn of a release of hazardous substances that has not been proven to have occurred.  Because they have failed to demonstrate the underlying fact of VOC migration on which their claims rely, plaintiffs cannot recover

on any of their VOC-related claims.[7]

B. <u>Trash and Odors</u>

Plaintiffs' claims for inverse condemnation and nuisance depend in part on their allegation that trash has blown onto their property from the landfill, and their claim for nuisance also depends in part on the allegation that odors came over from the landfill. Plaintiffs' witnesses Bert Crane and John McGill testified that trash blew over from the landfill and onto the Crane property. They also testified that a strong odor came from the landfill. Based on the testimony, the court finds it more likely than not that trash from the landfill blew onto the Crane property and that the odor of the landfill is present on the Crane property.

While plaintiffs have demonstrated that trash and odors came from the landfill onto their property, they failed to

---

[7] Because the court finds that plaintiffs have not met their burden of showing that VOCs migrated from the landfill to Lot 1, it is unnecessary to reach plaintiffs' argument that the property value of their land has diminished to zero by virtue of the expense of hazardous waste cleanup that would be required under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9675. Even if the court found that chemicals did exist in Lot 1, plaintiffs have not shown that cleanup would be necessary. While there is no minimum quantity or concentration of a substance required to trigger CERCLA cleanup, <u>A & W Smelter & Refiners, Inc. v. Clinton</u>, 146 F.3d 1107, 1110-11 (9th Cir. 1998), "the EPA may issue an order under [42 U.S.C.] section 9606(a) only if it determines there is 'an imminent and substantial endangerment to the public health or welfare or the environment.'" <u>Id.</u> at 1113 (quoting 42 U.S.C. § 9606(a)). Furthermore, individual liability under CERCLA exists only when cleanup is "necessary," 42 U.S.C. § 9607(a)(4)(B), which requires that "an actual or real threat to human health or the environment exist before initiating a response action." <u>Carson Harbor Village, Ltd. v. Unocal Corp.</u>, 270 F.3d 863, 871 (9th Cir. 2001). Plaintiffs presented no evidence that any VOCs in Lot 1 presented a risk to human health or the environment; indeed, defense expert Paul Damian's testimony stating that there was no risk was uncontested.

14

provide the court with any evidence concerning damages.  The property's highest and best use is cattle grazing, and the court heard no evidence that trash or odors could prevent cattle grazing or even any other use of the property.  While Mr. McGill testified that two of his cows died as a result of eating trash blown over from the landfill, he did not indicate that he would stop renting the property or attempt to negotiate for a lower rent payment as a result.  Plaintiffs must demonstrate their own damages, not someone else's damages.  There is a total lack of any evidence that trash or odors "interfere[d] with the enjoyment or use of land or property," Stoiber, 101 Cal. App. 3d at 919, and cannot recover on their claim for nuisance regarding the trash or odors.  Constitutional damages to property in inverse condemnation cases are damages "depreciating its market value." Albers, 62 Cal. 2d at 260.  While plaintiffs' witness Jeffrey Lien testified, albeit unconvincingly, that VOCs in the soil brought the property value to zero, no evidence was presented that trash would affect the property value.  If plaintiffs believed that the trash affected the property value, they could have asked Mr. Lien or another witness to testify as to that fact, but they did not.  Thus, plaintiffs cannot recover on their inverse condemnation claim regarding trash.

    C.  <u>Flooding</u>

        Plaintiffs raised a new theory of liability at trial, when Bert Crane testified that water from the landfill comes through a culvert under Highway 59 and floods a large portion of Lot 1.  However, defense witnesses Rod Andrews, the Solid Waste Division Manager for the Merced County Department of Public

15

Works, and Randolph Bardini, an engineer for the County, testified that only a small portion of the landfill actually drains into the culvert in question, and that there is actually less drainage into that culvert than there was before the landfill expanded in 2008.  Much of the water coming through the culvert actually originated on the Crane property or other non-landfill property.  Furthermore, plaintiffs introduced no pictures of the alleged flooding, and other pictures of Lot 1 show the land in a non-flooded state.  (See, e.g., Joint Trial Ex. 168.)  Plaintiffs have not demonstrated by a preponderance of the evidence that the landfill floods the Crane property, and therefore they cannot recover under any theory of liability for such flooding.

D. <u>Creeks</u>

Plaintiffs' claim for inverse condemnation depends in part on their allegation that creeks maintained by the County and flowing through the Crane property leave debris such as branches and tires when the creeks rise and then subside.  The court heard testimony from Bert Crane that over the years several tree branches from cottonwood and willow trees and at most seven tires have been deposited on the Crane property as a result of creek flooding.

Plaintiffs' evidence regarding debris was uncontested and the court finds that plaintiffs have demonstrated that branches and on occasion tires are indeed deposited on the banks of the creeks.  However, as with the trash and odors from the landfill, plaintiffs have not demonstrated any damages resulting from the debris, and thus they cannot succeed on a claim for

16

inverse condemnation.  See Yamagiwa, 523 F. Supp. 2d at 1088 (plaintiffs must prove that property suffered damage); Albers, 62 Cal. 2d at 260 (damages depreciating the property's market value are cognizable).  As with the allegations regarding trash, Mr. Lien, the appraiser, could have testified as to how the property value was affected by the creek debris, but he did not.

        The Merced Irrigation District owns the creeks, and the County is responsible for maintaining them.  The court finds no reason to believe that debris in a creek is anything but normal.  In fact, defense witness Kellie Jacobs, an administrative engineer for public works for the County, testified that the creek is supposed to contain some branches, giving birds a place to perch in the creek.  Plaintiffs have not demonstrated that debris from a creek that washes up on the banks is in any way harmful to the property value or that the County somehow effected a taking by failing to remove debris.

        Since plaintiffs have not demonstrated that the debris from the creeks depreciates the market value of the property, they cannot recover on a claim for inverse condemnation.

        IT IS THEREFORE ORDERED that plaintiffs take nothing on their claims and that judgment be entered in favor of defendant County of Merced and against the plaintiffs in this action.

        The Clerk of the Court is directed to enter judgment accordingly.

DATED:  February 8, 2011

_____
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE